Johnson, J.
The question whether the city of Cleveland was empowered to provide in its charter a method of nominating candidates for elective offices, which is different from the method prescribed by the general assembly, involves the construction of Article XVIII and Section 7, Article V of the Constitution, both of which became effective November 15, 1912.
Pertinent parts of Article XVIII are as follows: “Sec. 3. Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
“Sec. 7. Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government.”
In State, ex rel. Toledo, v. Lynch, ante, 71, it was held, that the provisions of Article XVIII continued in force 'the general laws for the government of cities and villages until the 15th of November, 1912, and thereafter, until changed in One of three modes': First, by the enact *343 ment of general laws for their amendment; second, by additional laws to be ratified by the electors of the municipality to be affected thereby; third, by the adoption of a charter by the electors of a municipality in the mode pointed out in the article. In that case it was held that no municipality was entitled to exercise the powers referred to in Section 3 until it had adopted a charter.
The people of the city of Cleveland having pursued the third' mode pointed out, the question presented here is, whether or not it was within their power to include in the charter adopted a method of nominating candidates such as above referred to.
It is contended by plaintiffs in error that the office of a charter, referred to in Section 7, is merely to provide a form of government and not to prescribe any of its functions. When construed in connection with Section 3 and the rest of the provisions of Article XVIII, and in the light of the manifest objects sought to be attained by their adoption, we think there is no warrant for giving this limited meaning to the language.
McQuillin, in his work on municipal corporations, says at Section 320: “The word 'charter/ when used in connection with a municipal corporation, consists of a creative act and all laws in force relating to the corporation, whether in defining its powers or regulating their mode of exercise.” Judge Dillon in his work on the same subject at Section 63 says: “The power and authority conferred by the constitution upon cities to frame their own charters extend to all subjects and matters properly belonging to the government *344 of municipalities, and this necessarily includes any subject appropriate to the orderly conduct of municipal affairs.”
The same proposition is declared and enforced in Schigley v. City of Waseca, 106 Minn., 94.
Under Section 7 the powers granted in Section 3 may be vitalized and made active. But, as in preparing a plan to accomplish any undertaking, the thing to be done, the purpose and scope of the plan,- must be understood and defined before any adequate conception can be had of the instrumentalities necessary to carry out and accomplish the purpose.
The rational conclusion from our. decision that Section -3 is not self-executing, but awaits the adoption of a charter, is that the charter should outline and define the scope of the plan referred to.
Under Section 3 municipalities have authority to exercise “all powers of local self-government” subject to the limitations stated in said section and in other parts of Article XVIII, which we will notice later on.
As to the scope and limitations of the phrase “all powers of local self-government,” it is sufficient to say here that the powers referred to are clearly such as involve the exercise of the functions of government, and they are local in the sense that they relate to the municipal affairs of the particular municipality.
It will not be disputed that one of the powers of government is that of determining what officers shall administer the government, which ones shall be appointed and which elected, and the method of their appointment and election. These are *345 essentials which are confronted at the very inception of any undertaking, to prepare the structure or constitution for any government. Obviously such power would be included among “all powers of local self-government,” which any municipality has authority to exercise under Section 3 of Article XVIII as to any officers of such municipality, unless the election of such officers is not a matter of municipal concern, or unless such power has been excepted in some manner from those granted.
Provisions similar to those found in Article XVIII of the Ohio Constitution as amended have been adopted by other states, although the grant of power is not so comprehensive in some, and in some of them there are greater restrictions than those found in Article XVIII.
In State, ex rel. Duniway, v. City of Portland, 133 Pac. Rep., 62, decided May 28, 1913, in which a kindred question to the one involved here was before the court, they say: “Municipal elections and the choice of municipal officers are matters of purely municipal concern; and, as to these, the' people of the city have ample power to legislate, subject only .to the restrictions heretofore noted.”
So in People, ex rel., v. Worswick, 142 Cal., 71. The provision of the constitution of California in effect at the time of the adoption of the charter was as follows: “Sec. 6, Article XI. Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns. * * * and cities and towns heretofore or hereafter organized, and all charters *346 thereof framed or adopted by authority of this constitution, except in municipal affairs, shall be subject to and controlled by general laws.”
The charter having included a provision as to registration, it was claimed that it conflicted with the general laws of the state and that registration was a matter subject to and controlled by general laws. The question was squarely made, therefore, as to whether such provision of the charter was a municipal affair within the meaning of the section of the constitution above quoted. The court say: “Indeed, the general laws of the state touching the registration of voters prior to state and county elections have no bearing on an election of city officers in a municipality governed by a freeholders’ charter except so far as they are adopted by the charter itself. It is conceded that the election here in question was a ‘municipal affair,’ and, of course, the city could have adopted any system of registry, or could have declined to have any at all.”
In Socialist Party v. Uhl, 155 Cal., 776, the constitutionality of a primary election law was involved. The statute exempted from its operation nominations to be held in municipalities which had adopted charters prescribing other methods. The statute was attacked on the ground that the exemption of the chartered cities made it not of uniform operation and therefore in violation of the constitution, the claim being that primary elections were state affairs and not municipal affairs. The court in the syllabus held: “So far as municipalities are concerned, the law stands the same as any other general law which, under *347 Section 6 of Article NI of the Constitution, is not binding upon a municipality as to matters which are strictly municipal affairs. The election of municipal officers is strictly a municipal affair.”
In Mitchell v. Carter, 31 Okla., 592, the city of Guthrie provided by charter for a ballot which should not contain any designation of parties but upon which the names of candidates should appear in alphabetical order. The court say: “It is further contended that the charter election law is in conflict with the general election law, in that the latter does not provide any means for placing upon the ballot the name of a nonpartisan candidate. That the election of municipal officers is strictly a municipal affair seems to be sustained by authority.”
In Graham v. Roberts, 200 Mass., 152, the question of the local character of a provision changing the method of electing, city officials in the city of Haverhill was involved, and the court say: “This was a matter of local concern, which is an exception to the rule that general legislative authority cannot be delegated.”
It is clear upon reason and authority that municipal elections are and should be regarded as affairs relating to the municipality itself, and, in the absence of fundamental limitations prohibiting, are things that may be provided for by the local government. This does not involve the loss by the state of its proper authority within the city.
It is true, as contended, that the state at large is interested in the purity of every election, municipal or otherwise, and is interested in making *348 provisions fixing, the qualifications of electors and for the preservation of the purity of the ballot effective throughout the state, but the state is likewise interested in the protection of every other right of the citizen and should and will throw around all of these rights every protection which can be afforded by the sovereign power. The state itself is interested in protecting the municipality in the exercise of every right and power granted to it by the constitution. Every energy of the state, executive, legislative and judicial, may be properly invoked and will respond to the protection of such rights.
But it does not follow from this that the state would or could interfere with the exercise of the powers of local self-government which the people of the state had conferred upon the municipality by their constitution. The method of electing municipal officers would seem to be a matter peculiarly belonging to the municipality itself. The very idea of local self-government, the generating- spirit which caused the adoption of what was called the home-rule amendment to the constitution, was the desire of the people to confer upon the cities of the state the authority to exercise this and kindred powers without any outside interference.
As stated, there are some limitations in Article XVIII on the grant of “all powers of local self-government.” There are provisions that laws may be passed to limit the power to levy taxes and incur debts for local purposes; to require reports from municipalities as to their financial ■ condition and transactions; to make examinations of books and' *349 accounts of municipal authorities and public undertakings conducted by such authorities.
There is also in Section 3, after the grant of authority to exercise all powers of local self-government, the limitation involved in the language, “and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.” •
The inclusion of these limitations in Article XVIII is a conclusive indication that the convention which framed it was conscious of the wide scope of the powers which they were conferring upon the cities of the state with reference to their local self-government.
• Not alone this, but in connection with the comprehensive grant they disclose the intention to confer on municipalities all other powers of local self-government which are not included in the limitations specified. Expressio unius exclusio alterius est.
There is - a further provision found in Section 14 of Article XVIII, pertinent parts of which are as follows: “All elections and submissions of questions provided for in this article shall be conducted by the election authorities prescribed by general law.”
The elections and submissions of questions provided for in the article are: First, the submission' to the electors of the municipality of “additional laws” passed by the general assembly; second, the submission of the question of acquiring public utilities; third, the submission of the •question, “Shall a commission be chosen to frame *350 a charter;” fourth, the election of the charter commissioners on a ballot bearing no party designation; fifth, the submission of the approval of the charter; sixth, the submission of the question of any amendments.
If the constitutional convention had intended that the election of all municipal officers should be conducted by the methods prescribed by general law, it is natural to suggest that so important an exception to the grant of all power of local self-government would have been included in the article.
It will be noted that the language of Section 14 is not that the elections referred to shall be conducted according to' the methods prescribed by general law, but shall be conducted by the election authorities prescribed by such law.
A consideration of Section 8 of Article XVIII strengthens our view in connection with this distinction. Section 8 provides for the submission of the question, “Shall a commission be chosen to frame a charter;” and provides that the ballot containing such question shall bear no party designation, and provision shall be made thereon for the election from the municipality at large of fifteen electors who shall constitute the commission, provided the electors voting in the affirmative are in the majority.
Section 5 provides for the holding of elections as to acquiring public utilities. All of these elections and submissions of questions are required by Section 14 referred to, to be “conducted” by the election authorities prescribed by general law, but in accordance with the method referred to in the article.
*351 Section 16 of the Cleveland charter itself provides that all elections shall be conducted, etc., by the election authorities prescribed by general law; and plaintiffs concede that in the matter of providing what officers shall be elected the provisions of the charter shall control the election board.
This brings us to a consideration of Section 7 of Article V, which it is contended applies in this case. The pertinent part of that section is as follows: “All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law, and provision shall be made by law for a preferential vote for United States senator; but direct primaries shall not be held for the nomination of township officers or for the officers of municipalities of less than two thousand population, unless petitioned for by a majority of the electors of such township or municipality.”
It will be remembered that this section and Article XVIII were adopted as amendments to the constitution on the same day. By that adoption they became parts and provisions of the same instrument. There are well-established rules by which they must be weighed. They must be construed together and effect must be given to both. Differences, if there are any, must if possible be reconciled. As stated in Cooley on Const. Limitations (7 ed.), p. 92: “One part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.” The mandate in Section 7, Article V, is to provide by law for the nomination *352 by primary or by petition of all elective state, district, county and municipal officers. Such a law applying throughout the- state to all of the officers named must of course be passed by the general assembly, and will therefore apply uniformly throughout the whole state and to every municipality which has not taken the steps pointed out in the Toledo case to “secure immunity from such general laws.”
It must be remembered that any statute passed under Section 7 of Article V, which provides by law for nomination, by primary or by petition, of all elective state, district, county and municipal officers, is a general law. But this general law passed under this provision must yield to a charter provision adopted by a municipality under a special constitutional provision, which special provision was adopted for the purpose of enabling the municipality to relieve itself of the operation of general statutes and adopt a method of its own to assist in its own self-government, and which charter when adopted has the force and’ effect of law.
Of course such a charter provision must be one which the municipality was authorized to adopt under the grant of authority to exercise all powers of local self-government. We have seen that the method of electing officers is a governmental function or power, and when the officer to be elected is' chosen solely for the performance of a municipal duty, it is a' municipal affair.
The provision of a charter which is passed within the limits of the constitutional grant of *353 authority to the city is as much the law as a statute passed by the general assembly. The constitution of California contains a provision with reference to the deposit of public moneys by which it is provided that any moneys belonging to the state or any county or municipality within the state, may be deposited in any national bank or banks within the state, or in any bank or banks organized under the laws of the state, in such manner and under such conditions as may be provided by law. The legislature passed a law providing for the deposit- of public funds of a municipality in any licensed national bank or banks within the state, but the charter of San Francisco prohibited any such deposit. In an action to enjoin the treasurer of the city from depositing the city’s money in a bank, the court, in Rothschild v. Bantel, 152 Cal., 5, say: “It is unnecessary to cite authorities to the well-settled proposition that under the ‘municipal affairs’ amendment to Section 6, of Article XI of the Constitution, adopted in 1896, provisions in a freeholders’ charter of a municipality as to municipal affairs are paramount to any law enacted by the state legislature, and that the legislature is without power to enact any law infringing thereon. * * * - In such a case the charter provision is the ‘law’ referred to in the constitutional provision. The provision is not that the deposit may be made in such manner and under such conditions as may be provided by the legislature, or by any particular kind of law, but is simply ‘as may be.provided by law.’ ” . .
*354 In State, ex rel. Duniway, v. Portland, supra, the court say: “Section 16 of Article II of the Constitution as amended June 1, 1908, among other things, provides: ‘Provisions may be made by law for the voter’s direct or indirect expression of his first, second or additional choices among the candidates for any office.’ Now a city charter enacted by the voters of the municipality is as much a law as if it were enacted by the legislature. A provision, therefore, made in such charter for the expression by the voter of his first, second, or third choices among the condidates for any office is - a ‘provision made by law’ for that purpose, and within the constitution.”
This proposition is also upheld in People, ex rel., v. Williamson, 135 Cal., 415; Grant v. Berrisford, 94 Minn., 45; State, ex rel., v. District Court of Ramsey Co., 87 Minn., 148; Kansas City v. Marsh Oil Co., 140 Mo., 458.
Even if it be conceded that Section 7, Article V, applies to nominations for officers in cities which have adopted charters, a charter which provides for such nomination by petition is a compliance with the requirement of that section. The section does not require that any particular form of petition shall be provided.
We remark as to Section 7, Article V, that it became effective January 1, 1913. Pursuant to its requirement, the legislature passed a law approved May 3, 1913, providing for nominations by primary election, or by petition, of all state, district, .county and municipal officers excepting in municipalities of less than two thousand popu *355 lation. By the terms of the law it does not become effective until January 1, 1914. Therefore, there is now no law passed by the legislature in effect, under Section 7, Article V. But it is' contended that the provision of the Cleveland ■ charter in question is obnoxious to the provisions contained in Section 3, Article XVIII, viz., “may adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws,” because it conflicts with the primary election laws in existence on January 1, 1913.
It is urged that the “general laws” referred to are all laws that may be passed in the exercise of the police power, and it is claimed that the nomination of candidates for public office is a matter to be provided for in the exercise of that power.
Our attention is called to the case of the State, ex rel., v. Felton, 77 Ohio St., 554. In that case the validity of Sections 2916 et seq., as amended April 20 and 23, 1904 (97 O. L., 107, 439), was attacked. The statute provided that when any voluntary political party in any county, township or municipal corporation, by a vote of a majority of its controlling committee shall cause notice of the holding of a primary election and shall make application to the deputy state supervisors and inspectors of elections, or other proper board, such primary election shall be held under the provisions of this act.
The whole proceeding in its inception was the voluntary act of the political party. No party was compelled to nominate its candidates under this *356 law, but could nominate in its own way if it desired. The court sustained the validity of the statute on the ground that a party having decided to nominate its candidates in the manner referred to, the proper conduct of the primary was a matter that concerned the general welfare, and that in the exercise of the police power the legislature might make such reasonable regulations as would safeguard and keep the primary free from fraud. The court say at page 580: “Our statutes are not mandatory. The statute, so far as present legislation goes, only consents upon request by a political party to supply the facilities for holding the contest in the party and to act as umpire.” It was in nowise the purpose of the statute involved in the Felton case to prescribe and enforce a method, but merely to furnish the facilities to assist recognized and organized portions of the citizenship to have their own method accomplished in keeping with decency and the good order of the community.
As we have already pointed out in this opinion the prescribing and defining of a system or method for the nomination and election of officers is a governmental function, and involves the exercise of political power.
Provisions for safeguarding the method are within the police power. In Freund on Police Power, Section 3, it is said: “From the mass of decisions, in which the nature of the power has been discussed, and its application either considered or denied, it is possible to evolve at least two main attributes or characteristics which differentiate *357 the police power; it aims directly to secure and promote the public welfare, and it does so by-restraint and compulsion.” And at Section 22: “The police power restrains and regulates, for the promotion of the public welfare, the natural or common liberty of the citizen in the use of his personal faculties and of his property. The state may also promote the public welfare to the use of what we may call its corporate capacity. This capacity belongs to the sovereign state as a matter of course, so that it may hold and dispose of property, make contracts, employ agents or servants, and sue; and it may be bestowed by it upon subordinate political divisions like counties, cities, school districts, etc.”
The system or plan to be • followed in' the nomination and election of the officials of any city is only of interest and concern to the people within the limits of the city, and when governmental powers have been conferred upon the city, it acts within its authority when it adopts its owi plan, provided it violates no constitutional require ment. Cases cited in the briefs show that the exercise of eminent domain, that rules for assessments on private property for public improvements and that conditions imposed concerning suits for damages, have all been sustained under charters providing for local self-government.
Section 4963, General Code, which was in effect prior to the adoption of the amendment, Article V, Section 7, reads as follows: “Primaries under this chapter to nominate candidates for county offices or to select delegates to nominate candidates *358 for state or district offices, .shall be held in each county at the usual polling places on the third Tuesday of May of even-numbered years, and primaries held to nominate candidates for township and municipal offices, justices of the peace and members of the board of education shall be held in each county at the usual polling places on the first Tuesday after the first Monday in September of odd-numbered years.”
That section is repealed by the act referred to, supra, which will be in effect January 1, 1914.
It will be noted that Section 4963 and cognate sections do not provide for nominations by direct primaries of candidates- for state and district offices, but do provide for such nominations of candidates for county offices and for all municipal offices.
The schedule, adopted at the time the amendments were, provides that they shall be effective January 1, 1913, and that all laws not inconsistent therewith shall'. continue in force until amended or repealed.
This law, therefore, as to state and district officers and as to cities and villages of less than two thousand population, is invalid because inconsistent with Section 7, Article V of the Constitution.
But assuming that this law, invalid in so many important parts, is still effective as to the portions not thus impaired, it is simply a general statute of the ■ state, and could in no sense be held to supersede the provisions adopted by the city of Cleveland' in its charter in compliance with the fundamental law.
*359 Concerning the provision in Section 3, Article XVIII (may adopt such local police, sanitary and other similar regulations as are not in conflict with general laws), the general laws referred to are obviously such as relate to police, sanitary and other similar regulations, and which apply uniformly throughout the state. They involve the concern of the state for the peace, health and safety of all of its people,, wholly separate and distinct from, and without reference to, any of its political subdivisions—such as regulate the morals of the people, the purity of their food, the protection of the streams, the safety of buildings and similar matters.
Manifestly, therefore, it was necessary, when the constitutional convention was conferring all powers of local self-government on cities, to provide that, in the adoption of such regulations by any city for itself (police, sanitary and similar ones), they should not conflict with general laws on the subject.
It is a well-settled rule that the body adopting amendments, such .as are here involved, will be presumed to have had in mind the course of legislation and existing statutes touching the subjects dealt with. People, ex rel. Jackson, v. Potter, 47 N. Y., 380, and cases cited. The legislature of Ohio in the codifications adopted by it, covering many years, including the last one adopted, has included a separate title, designated by it "Police Regulations ” in which it has included the general laws of the character we have above described. If it had been intended that the limitation should comprise the wide and- elastic scope contended for, it would have been so expressed.
*360 We think it clear that the regulations referred to in Section 3 are such and such only as we have indicated, and that it would be contrary to the import of the language and to the intent of the framers of the amendment to hold that by this clause there is denied to cities the authority to adopt charter provisions concerning the manifold subjects within the field of proper municipal activity, unless they are “not in conflict with general laws” on the subjects proposed to be dealt with.
Such a holding would disregard the purpose of the people in making the amendment. If the construction indicated is a correct outline of the extent of the authority conferred in Article XVIII, then the constitutional grant would seem to be a vain and empty thing, of no actual value.
There has been a new distribution of governmental power. The distribution has been made by the people. This court held in Cass v. Dillon, 2 Ohio St., 608, “The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers.” But during the life of the constitution of 1851, until the amendments, our cities exercised only such powers as were granted to them by statute. All agree that Article XVIII was adopted for the purpose of changing that condition and of materially adding to the governmental status and power of our cities and villages.
And yet under legislative control they had as much real power as is conceded to them by the construction contended for, by which they would be compelled to run all of their acts in the channels fixed by the general assembly.
*361 The experiences which created the public sentiment that led to the adoption of this amendment are well understood and they are not confined to Ohio.
The admiration that has been everywhere excited for the work of the founders of our national and state governments has been justified by their service.
The general powers of each were well defined. But the municipal governments were not so favorably initiated or developed.
Existing before the ■ institution of our system and without any constitutional definition of their powers, they fell by a sort of passive consent, and because it was deemed wise, under the control of the state legislatures.
The ever-increasing needs and importance of urban populations were attended by a remarkable series of legislative makeshifts in the effort to meet these conditions, with results not at all satisfactory.
It would seem to be evident that' the administration of municipal affairs is a matter that is purely •practical and local, wholly without important connection with the policies, partisan and otherwise, which naturally affect the operations of the national and state governments, 'but by reason of the procedure followed the government of cities has been largely deterniined and controlled by these extraneous influences.
Inefficiencies and imperfections of admitted and disquieting importance have long been too apparent in the conduct of these local affairs of the people.
*362 That which is called the municipal problem is and has been for many years a matter of serious concern to students of our institutions. It is natural that these imperfections and inefficiencies should be attributed to the system under which they have occurred, and it is also natural that the people should desire to try the experiment of bringing these governments closer to themselves.
However, the business of the court is to ascertain from these, amendments what the people intended by their adoption—what changes have been made. Their wisdom is not the concern of the court. Impressed with these admonitions we have arrived at the result ‘ stated, and the judgment will be affirmed.

Judgment affirmed.

Wanamaeer and Wilkin, JJ., concur.
Shauck, Donahue and Newman, JJ., 'dissent.